(No. 42193.—)

STUDENT HOUSE, INC., *et al.*, Appellants, *vs.* THE BOARD OF REGENTS OF REGENCY UNIVERSITIES *et al.*, Appellees.

*Opinion filed December 19, 1969.*

ASH, ANOS and HARRIS, of Chicago, (JOSEPH ASH, of counsel,) for appellants.

CHARLES A. BANE and ISHAM, LINCOLN & BEALE, both of Chicago, (CALVIN D. TROWBRIDGE, RICHARD E. POWELL, and DAVID J. ROSSO, of counsel,) for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The plaintiffs in this action are Student House, Inc., an Illinois corporation, and Lary G. Stone, Henry S. Frank and O. Hosmer Morse, who are partners doing business as Stone, Frank, Morse & Associates. Student House, Inc. operates a 300-bed private student housing facility at Northern Illinois University and the partners own the stock of Student House, Inc. The defendants are The Board of Regents of Regency Universities, named individuals who

are or have been members of the former governing bodies of Northern Illinois University, and its present and former presidents. From a summary judgment in favor of the defendants the plaintiffs appealed to the Appellate Court, First District. Because of the importance of a prompt final disposition, it was ordered that the appeal be taken directly to this court under Supreme Court Rule 302(d). Ill. Rev. Stat. 1967, ch. 110(a), par. 302.

The complaint alleged that in 1963 and 1964 Northern Illinois University faced a serious student housing shortage, and that in order to induce private investors to provide housing facilities to meet the needs of the University certain officials of the University made the following "representations and commitments":

"(a) That they needed the help and support of private investors in resolving the critical student housing shortage at the University;

"(b) That only large private housing facilities could satisfy the present and future student housing needs of the University;

"(c) That the defendants were not interested in being in the 'housing business', that the 'housing business' was a big headache to the University;

"(d) That if private capital would meet the University student housing needs, defendants would not build any additional student dormitories at the University;

"(e) That the defendants would not in the future expand the University student housing facilities to the detriment of the private investors;

"(f) That defendants would take into consideration the private investors and their private student facilities in the formation and implementation of all future University plans, programs, rules and regulations."

The complaint also alleged that in reliance on these representations and commitments the plaintiffs invested sub-

stantial sums of money to build and operate a private housing facility, known as "Student House", near the campus of the University; that the governing board of the University disregarded the representations and commitments, proceeded with plans for the expansion of the University-owned student housing facilities, and in each of the years 1965, 1966 and 1967 increased its student housing capacity by 1000 beds; that an additional 1000-bed facility was proposed in 1968; and that at the time this suit was instituted the University was negotiating for the purchase of an existing 1000-bed private dormitory. It was further alleged that the University enforces rules which require that all University-owned dormitories must be completely filled before students are permitted to rent rooms in private facilities. The plaintiffs alleged that as a result of the conduct of the defendants, they have consistently lost money in the operation of Student House since it was opened for occupancy in 1966, and now find themselves in precarious financial condition.

The complaint prayed for the entry of a decree enjoining the defendants from:

"(1) Constructing, purchasing, leasing or otherwise acquiring any additional student housing facilities, and from engaging in any actions, preliminary or otherwise, in preparation for or contemplation of constructing, purchasing, leasing or otherwise acquiring any additional student housing facilities;

"(2) Promulgating and enforcing any rule, regulation or standard for the administration or operation of large private student housing facilities which substantially differs from or is at variance with any rule, regulation or standard governing the administration or operation of UNIVERSITY student housing facilities;

"(3) Promulgating and pursuing any plans, programs, rules and regulations which breach and violate the aforesaid commitments and promises."

It also prayed for a decree "ordering and requiring de-

fendants to promulgate and pursue plans, programs, rules and regulations, and to otherwise act in conformity and in compliance with the aforesaid declarations, representations, commitments and promises." Compensatory damages were also requested.

After their motion to dismiss the complaint had been denied, the defendants moved for summary judgment. The motion was continued to permit the plaintiffs to have access to the records, files, and documents of the defendants and of the former governing boards of the University. Depositions were also taken. Ultimately, summary judgment was entered for the defendants on affidavits, depositions, and answers to interrogatories which had been filed.

On this appeal the plaintiffs insist that the summary judgment was erroneously entered because issues of fact remain undetermined. We have carefully examined the materials which were before the trial court and we are of the opinion that summary judgment was properly entered.

It is the position of the plaintiffs that with respect to Northern Illinois University the State has precluded itself from furnishing housing for the students attending the University. That disability is to continue so long as the housing needs of the students are met by privately financed housing, operated for a profit. It is the position of the plaintiffs that the adequacy of the supply of privately financed housing is to be determined by a court which would presumably review the situation from time to time and issue its pronouncement. It is further the position of the plaintiffs that the burden is upon the University to establish that the supply of privately financed housing is inadequate before any additional student housing units may be constructed by the University. The relief sought by the plaintiffs would not directly affect the defendants. It could, however, have a serious impact upon the students attending the University during future years.

A statement of the terms of such a contract would immediately give rise to questions as to the authority of the governing board to abdicate its responsibility in this fashion. The complaint in the present case, however, does not allege the execution of any contract embodying the terms which are sought to be specifically enforced. Instead, the complaint alleges what are described as "representations and commitments" made by various members of the staff of the University and acted upon by the plaintiffs. In legal theory the plaintiffs predicate their right to the relief they seek upon doctrines of apparent authority in the law of agency and upon principles of equitable estoppel. We turn, therefore, to a consideration of the source of the "representations and commitments" relied upon.

Northern Illinois University, founded at DeKalb in 1895 as the Northern Illinois State Normal School, was originally controlled by its own board of trustees. (Laws of 1895, p. 69.) After a series of administrative reorganizations culminating in 1954, the school, then known as Northern Illinois State Teachers College, came under the authority of a state-wide Teachers College Board. In 1957 the college was renamed Northern Illinois University (Ill. Rev. Stat. 1957, ch. 122, par. 450b), and in 1965 the Teachers College Board became the Board of Governors of State Colleges and Universities (Ill. Rev. Stat. 1965, ch. 122, par. 577.1). In 1967, control over Northern Illinois University and Illinois State University at Normal was transferred from the Board of Governors to the newly created Board of Regents of Regency Universities, one of the defendants in this case. Ill. Rev. Stat. 1967, ch. 144, par. 301 *et seq.*

The Board of Regents is "constituted a body corporate and politic" and has the statutory power and duty, among other things, to enter into contracts and to sue and be sued. (Ill. Rev. Stat. 1967, ch. 144, par. 307.) It is authorized to "make rules and regulations, establish practices and pre-

scribe policies, not inconsistent with the law, for the management, operation, control and maintenance of the Regency Universities, and their employees, students and property." (Ill. Rev. Stat. 1967, ch. 144, par. 308(b).) The Board of Governors of State Colleges and Universities and the Teachers College Board, the predecessor governing bodies of the University, had similarly broad statutory powers of management and control. Ill. Rev. Stat. 1965, ch. 122, par. 577.8; Ill. Rev. Stat. 1957, ch. 122, par. 462.

What is at once striking about the plaintiff's position is that none of the "representations and commitments" they rely upon was made by the present or a former governing board of the University, or even by any individual member of those governing boards. Nor was any representation or commitment made by the president of the University. Indeed, it appears from the depositions which were before the trial court that none of the plaintiffs had any direct contact whatsoever with any president of the University or with any of the members of its governing body. It does appear, however, that the plaintiffs had read newspaper accounts of statements reported to have been made by the president of the University before the zoning board of appeals of the city of DeKalb. With this exception, the "representations and commitments" relied upon were made by the director of student housing, the assistant director of student housing, and the director of research of the University.

"Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." (Restatement (Second) of Agency, § 8, comment c.) Even if we were to assume that the ordinary rules of agency are fully applicable to public officers exercising the responsibilities here involved (but see Restatement (Second) of Agency, Scope Note p. 2), it would remain entirely clear that in a matter so extraordinary as the abandonment of governmental responsibility that is alleged in this complaint, it was unreasonable as a

matter of law to rely upon the "representations and commitments" of lower echelon members of the University staff.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*